**[Cite as *Lashaway v. Lashaway*, 2026-Ohio-1168.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

| | |
|---|---|
| Richard Lashaway, et al. | Court of Appeals No. {86}WM-25-009 |
| | WM-25-010 |
| Appellees | |
| | Trial Court No. 20244001 |
| v. | |
| Margo K. Lashaway, et al. | **DECISION AND JUDGMENT** |
| Appellants | Decided: March 31, 2026 |

* * * * *

Christopher B. Walker, Esq., and Jilene E. Richards, Esq., for appellees.

James F. Duranczyk, Esq., and Mark D. Hagans, Esq.,
for appellant, Margo K. Lashaway, Trustee.

Daniel R. Michel, Esq., for appellant, Jason D. Bailey.

* * * * *

**DUHART, J.**

{¶ 1} Appellants, Margo Lashaway and Jason Bailey, appeal the March 28, 2025

judgment of the Williams County Court of Common Pleas rescinding the sale of a farm

property from Margo, as trustee of the Lashaway Family Trust, to Jason. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} This case arose from the sale of a farm property by Margo, as trustee of the Lashaway Family Trust, to Jason. Following the sale, six of the trust beneficiaries—appellees, Richard Lashaway, Perry Lashaway, Jeffrey Lashaway, Steve Lashaway, Amanda Lennard, and Connie Salisbury—filed a complaint against Margo, as trustee, Jason, and trust beneficiaries, Brandie Bailey and Brenda Haehl (a.k.a. Brenda Dick). In their complaint, they alleged that Margo and her husband, Raymond Lashaway, created the Lashaway Family Trust in May 2002. They were the settlors and trustees of the trust, which had real property in Pioneer, Ohio, as its only asset. Before being transferred into the trust, the property had belonged to Raymond's parents, and the property was transferred to Raymond following the death of his surviving parent, based on an agreement with his siblings, Connie, Melvin Lashaway, and Lloyd Lashaway. Raymond, Melvin, and Lloyd are all deceased. Following Raymond's death, Margo became the sole trustee of the trust.

{¶ 3} Raymond lived in the property until his death in December 2020. Margo lived there until September 2023. After Margo moved out, the beneficiaries learned that Margo sold the property to Jason for $80,000. Jason is Brandie's husband and Margo's son-in-law. The beneficiaries believed that the property was worth at least $140,000 at the time of the sale, and they believed that both Margo and Jason knew that the property

2.

was worth more than $80,000 at the time of the sale. They also believed that Margo and Jason had a copy of the trust and actual knowledge of the trust's terms and that the sale exceeded Margo's authority as trustee or was an improper exercise of her powers as trustee.

{¶ 4} Of the $80,000 Jason paid for the property, $5,313.75 went to Brandie as a trust beneficiary, $33,823.85 was paid to the National Bank of Montpelier to pay off a note in Margo's name, individually, and $1,661.68 was used to pay property taxes, despite a term in the trust requiring the occupants to pay property taxes.

{¶ 5} Based on these facts, the beneficiaries raised six claims.[1] In count one, they claimed breach of trust against Margo based on her "self-dealing and providing an unjust benefit to a member of her family to the detriment of" the beneficiaries by selling the property to her son-in-law for less than fair market value and paying her personal debts from the proceeds.

{¶ 6} In count two, they claimed bad faith dealing against Jason based on him purchasing the property for inadequate consideration. The beneficiaries alleged that Margo was elderly and susceptible to being influenced by others; Jason "asserted apparent authority or otherwise unduly influenced [Margo] by orchestrating the sale of the Property to himself at a reduced purchase price and representing to [Margo] and others that all Plaintiffs had consented to the sale"; and Jason had a copy of the trust,

---

[1] The beneficiaries moved to withdraw, and the trial court dismissed, count four at the beginning of trial.

3.

knew of the beneficiaries, and knew that the sale was a violation of Margo's duty to sell the property at fair market value.

{¶ 7} In count three, the beneficiaries alleged fraudulent conveyance against Jason. They claimed that Margo was susceptible to undue influence based on her "age and living circumstances," Jason had the opportunity to exert undue influence on Margo as she was leaving her home to reside in Jason's home or the home of Jason's adult child, Jason exerted undue influence on Margo to sell the property to him for less than fair market value for his sole benefit, and Jason falsely represented to Margo and her attorney that the beneficiaries had consented to the sale to induce them to close the sale, and Jason did so with the actual or constructive intent of defrauding the beneficiaries.

{¶ 8} In count five, the beneficiaries alleged unjust enrichment against Margo and Jason. They claimed that Margo obtained repayment of her personal debt using trust assets wrongfully withheld from the beneficiaries, and Jason, through fraud and undue influence, received titled to the sole trust asset without payment of adequate consideration.

{¶ 9} Finally, in count six, the beneficiaries requested the imposition of a constructive trust on the property because Jason wrongfully obtained a legal interest in the property, which he should not be allowed to retain.

{¶ 10} The beneficiaries asked the court to (1) void the transfer of the property to Jason, (2) compel Margo, as trustee, and Jason and Brandie to return title of the property to the trust, (3) impose a constructive trust on the property, (4) remove Margo as trustee,

4.

(5) appoint a special fiduciary to take possession of the property and sell it at fair market value, (6) distribute the proceeds of the sale to them, (7) award them attorney fees, and (8) make Margo and Jason pay all costs. Alternatively, the beneficiaries asked that the court award them a money judgment against Margo and Jason "in an amount equal to what [their] distributable share of proceeds from the sale of the Property should have been, but for the wrongful acts of" Margo and Jason.

{¶ 11} The Lashaway Family Trust, which the beneficiaries included as an exhibit to their complaint, provides in Article 1 that

> 1. During the Settlors' lives and as long as either Settlor lives in the house for ten months per year, pays all real estate taxes, maintains fire and wind-storm insurance coverage, and maintains the property in good condition, Settlors shall have the right to continued use and occupation of the property.
>
> . . .
>
> 2, After the termination of the right of occupancy by reason of death or otherwise, the property will be sold at a fair market value and from the proceeds of the sale the trustees will pay to the Settlors, or their beneficiaries, an amount equal to the amounts expended by the Settlors to enhance or improve the real property subject to this trust. The balance shall be divided in four shares and distributed per stirpes to Melvin Lashaway, Lloyd Lashaway, Raymond Lashaway and Connie Fae Salisbury.

{¶ 12} The case was tried to the court. The beneficiaries presented the testimony of attorney, Michael Shaffer; Connie; appraiser, Robin Hershberger; Perry; and Amanda. Jason presented the testimony of appraiser, Elizabeth Sigg, and Brandie, and testified in

5.

his own behalf.  Margo testified in her own behalf.  The following evidence was adduced at trial.

{¶ 13} Shaffer testified that he reviewed the Lashaway Family Trust with Margo in 2021, after Raymond's death, and advised that her right of occupancy continued and that she could remain in the home until her death or until she no longer desired to use it. He also told her that she was the trustee and she was in control of the property.  He explained in general terms that the trust provided her with the right of occupancy and that she was in control of the property.  He recalled confusion in 2021 about who was in charge, including a belief by some family members that Connie had authority, and he alleviated Margo's fears by explaining her authority as trustee.  Shaffer remembered two 2021 meetings.  The first was to identify estate needs and the second was after he pulled the trust and estate records to explain Margo's rights and responsibilities.

{¶ 14} Shaffer described a 2023 meeting, between July and September, at which Margo stated she no longer wanted to reside at the property and intended to sell the farm to Jason.  He discussed with Margo her responsibilities under the trust, the sale process, and the trust's fair market value requirement.  He told Margo that upon her death or desire to leave the property, the trust required that the property be sold at fair market value with the proceeds distributed to the beneficiaries or their children.  He understood that Margo and Jason had discussed and agreed to a purchase price of $80,000 before the meeting.  He addressed fair market value with Margo and Jason, and reviewed the county auditor's value online, noting that it exceeded the proposed purchase price.  Jason told

6.

him that the property was "in a state of disrepair and that there were a lot of things that needed to be done and that that was the basis of why it was believed that the lesser value was an appropriate fair market value." Shaffer explicitly told Margo that she owed a duty to all of the beneficiaries and warned her that she could be held responsible if the sale was not at fair market value. He specifically testified that he would not have proceeded with the sale if he knew that the family disagreed with the price. But "it was apparent from that conversation that Connie was consulted with about that value, that there was an indication that the family was acceptable with that value." He concluded after the discussion that the family believed $80,000 was fair and proceeded to prepare the purchase agreement.

{¶ 15} Shaffer testified that his basis for believing that the beneficiaries were in agreement came from speaking with Margo and Jason. "[A]fter that conversation which was, you know, quite lengthy, it was concluded that eighty thousand (80,000) [sic] was a number that everybody was okay with it and we should proceed to purchase based upon that number. . . ." As far as who Jason had spoken to, Shaffer said,

> I was certainly aware that there were ongoing conversations with Connie based upon that meeting. But as to each beneficiary, I did not have any representation that each of them had been contacted, but I was certainly aware that family discussions had been taking place and it was represented that eighty thousand dollars ($80,000.00) [sic] was a value that was acceptable to the family.

{¶ 16} Shaffer confirmed that he drafted the purchase agreement based on information from Margo as trustee and Jason, and his office closed the transaction. He explained the closing statement showing the $80,000 price and net cash to the trust of

7.

$43,259.97, with deductions including closing costs, delinquent and prorated taxes of $1,661.68, and a $33,823.85 mortgage payoff to State Bank. He said that the occupants were responsible for property taxes during occupancy and confirmed that the taxes were charged to the seller to the date of closing, as was customary. He identified the mortgage payoff as a loan belonging to Margo Lashaway and Raymond Lashaway. Based on the trust's terms and available closing funds, he prepared and sent a final report and distribution letter to each beneficiary.

{¶ 17} On cross-examination, Shaffer confirmed that he did not set up the trust and first met Margo after Raymond's death. Their initial meetings in 2021 focused on who owned and controlled the property and on clarifying the trust. Shaffer would have told Margo after reviewing the trust that she was the trustee and "in charge," and he believed that she left the second 2021 meeting understanding that she could stay on the farm and that she was in charge. He believed that Margo was not sophisticated in real estate or trust matters and said that Raymond had handled property issues and she stayed out of them. Regarding Connie, Shaffer understood she was the last of Fay's children and had influence in the family, and that Connie gave her input before the $80,000 purchase price was determined.

{¶ 18} On fair market value, Shaffer said he did not know if $80,000 was fair market value and that he did not provide fair market value opinions. He was concerned that the value on the auditor's website was more than the sale price, but he relied on the condition issues Jason told him about and the representation that the family agreed to the

8.

number. He confirmed having a meeting with Margo and Jason in July 2023 during which they discussed the sale at $80,000 and said Connie had agreed to the terms. Shaffer recalled discussing that the auditor's value was higher, condition problems, demolition costs for buildings, and the idea that fair market value can be a range. He emphasized that he forcefully advised Margo about her responsibilities, that it was not just her money, and that she was in charge as trustee. He prepared the purchase agreement consistent with the trust and closed accordingly. While beneficiary signoffs are not his office's practice, obtaining them would have ensured that each beneficiary was informed about and on board with the terms of the sale. He acknowledged being concerned about Margo's potential liability and said that getting the beneficiaries' signatures would have provided some assurance that they were on board, despite not being required by the trust.

{¶ 19} Addressing what Margo and Jason told him about the beneficiaries' knowledge, he knew that Connie gave her input before the $80,000 price was reached and remembered talking about "the family" agreeing with the price. He was unclear about exactly who gave him the information. Further, he would have asked more questions had he known a majority of beneficiaries did not know the sale was being discussed. He reiterated that he would not have prepared the purchase agreement without knowing that the family agreed the price was fair.

{¶ 20} Regarding what he told Jason and Margo about fair market value, Shaffer testified that he discussed the trust's fair market value requirement in Jason's presence,

9.

reviewed the auditor's value, discussed the property's condition, and warned Margo she had a duty to beneficiaries and could be sued for breaching it. He told Margo that all beneficiaries should agree that the price was a fair value if she proceeded with the $80,000 sale to Jason. He confirmed that there was no appraisal before closing and that he based fair value on a willing seller and buyer, knowledge of condition, and the representation that the family believed the amount was fair.

{¶ 21} As to when Margo knew about her duties and that she had control of any sale, Shaffer said that by the second 2021 meeting he believed Margo understood she could stay, was in charge, and that the property would remain in trust. In 2023, he again advised her that she had the power to sell, told her about her fiduciary duties and the potential for a lawsuit, and proceeded to draft the purchase agreement after concluding that she understood and the family agreed on price.

{¶ 22} Connie testified that she is the last surviving child of Fay and Louis Lashaway, and is the sister of Melvin, Lloyd, and Raymond. The family farm, a 20-acre property with several buildings, was appraised at $150,000 during Fay's estate proceedings. Fay's will directed that the farm be sold, but the siblings agreed that Raymond and Margo could remain living on the farm if they assumed the mortgage and maintained the property. Connie, as executor, deeded the farm to them in April 2002, allowing them to borrow $65,000 to settle estate debts, which included a mortgage note. The Lashaway Family Trust was then established to allow Raymond and Margo to live

10.

on the farm while also ensuring that the siblings would eventually receive their inheritance from Fay.

{¶ 23} Connie believed that Margo, as trustee, would handle any future sale and notify the beneficiaries. She consistently viewed herself as a beneficiary, not as a decision-maker. After Raymond's death in December 2020, Connie directed inquiries about purchasing the farm to Margo.

{¶ 24} In July 2023, Jason approached her about buying the farm for $80,000. Although she was surprised by the price, Connie was willing to consider it. She assumed that Jason would contact the other beneficiaries and that Margo was aware of his plan. She learned of the completed sale in September 2023. Her first post-sale communication from Margo was a trustee's final report and a check, which she did not cash.

{¶ 25} Connie understood that the trust was created so that Raymond and Margo could live on the farm for as long as they wanted while maintaining and insuring it, paying taxes, and keeping it in good condition. She believed that the trust would ensure that she and her brothers would eventually inherit the farm's value consistent with their parents' wishes. She testified that her role was only as a beneficiary and that Margo, as trustee, was in charge of trust matters and responsible for keeping the beneficiaries informed. The family expected to be notified when it came time to sell, though Connie acknowledged that the trust does not require beneficiary notification.

{¶ 26} Connie testified that the trust followed a family plan devised after Fay's death to avoid selling the farm during probate proceedings. The family's decision in

11.

2002 allowed Raymond and Margo to stay if they assumed the mortgage and paid Fay's debts, paid taxes, and maintained the farm. It also allowed them to keep any income from the farm. Raymond and Margo borrowed approximately $65,000 to pay the estate's obligations, including the mortgage. Connie transferred the property to Raymond and Margo in April 2002 so they could use it as collateral to obtain the loan and fund the estate. She believed that Raymond and Margo, not the siblings, were responsible for that debt, and she had no expectation that her share of the proceeds from the farm would cover their loan. She further testified that the trust required a sale at fair market value and allowed repayment of settlor "improvements," not personal loans, from sale proceeds.

{¶ 27} Connie said that Jason first approached her at her home in early July 2023 to tell her that he wanted to buy the farm for $80,000. He would use money he inherited from his mother and wanted to build a house that would include living space for Margo. Jason told her he was "coming to [her] first," mentioned being buddies with Perry, told her that land values were decreasing, and told her that he was going to the bank and needed the price to be at $80,000. Connie did not tell him that she was the trustee or authorized to bind the other beneficiaries. She assumed that Margo knew of the plan. Jason did not tell her about any outstanding mortgage balance or delinquent taxes during that conversation.

{¶ 28} Later, Jason sent Connie several text messages related to the sale. He sent her a screenshot showing the auditor's $126,500 appraisal and a message that he was

12.

"talking to the bank" and needed to be "around 80,000," to which she replied that she thought the estimate would be more but did not want him strapped and said, "let's move forward." Connie testified that she spoke only for herself, expected that the other beneficiaries would weigh in, and believed that Margo, as trustee, had to handle notifying and negotiating with the other beneficiaries.

{¶ 29} Connie learned of the completed sale while meeting with her attorney in late September 2023. She had not discussed the sale with Margo beforehand. She later received a trustee's final report and a $10,627.50 check, which she gave to her attorney without cashing. This was not what she believed she agreed to in July. After learning of the sale, she texted Jason, expressing regret that she had not referred him to the other beneficiaries and noting that the auditor showed him as owner as of September 6, 2023. On cross-examination, Connie acknowledged that the trust document was the only written record of the family's agreement, despite some unwritten understandings. She admitted not sending Jason to Margo in July 2023, unlike what she had done with earlier purchase inquiries.

{¶ 30} Connie acknowledged that the trust does not require Margo to notify the beneficiaries before a sale. She admitted that Margo was not present at the 2002 family meeting, and she did not know what Margo understood about the trust at that time. Connie received a draft of the trust in 2002 before Raymond and Margo signed it and was told to pay particular attention to Article 1. She agreed that there were no trust terms requiring that the mortgage be paid off before distribution, and that the trust text used

13.

"proceeds" without differentiating net from gross. Regarding buyer inquiries, she confirmed that after Raymond's death, she told two separate third parties to contact Margo, the trustee. She admitted she did not send Jason to Margo in July 2023 and did not ask him to get an appraisal or consult all the beneficiaries. Regardless, she told him, "let's move forward," despite her reservations. She agreed that there were no further communications from her to Jason between that text message and September 2023.

{¶ 31} On re-direct, Connie reiterated that she relied on an attorney to incorporate the family's agreements into the trust, she understood that Margo was trustee, and she believed that the trustee could repay improvements but not personal loans from sale proceeds. She assumed that Jason had discussed the sale with Margo due to his statement about her living in the new home. Connie emphasized that she did not think that she was the last stop for approval, and she expected that others would take issue with the $80,000 price.

{¶ 32} Robin Hershberger, a state-certified real estate appraiser in Ohio with over 20 years of experience, testified about her appraisal of the farm property. She conducted a land-only appraisal because she did not have access to the buildings. That is, the appraisal hypothetically treated the property as if it were vacant land. To complete her appraisal, she obtained the tax card from the Williams County auditor, visited the farm, and chose comparable sales. Hershberger searched for comparables within 90 days to 12 months, prioritizing proximity and acreage similarity, and using MLS and auditor data. She selected comps of 5.4, 31, and 35 acres. She ultimately concluded that the land had a

14.

value of $7,000 per acre, so the total 20-acre farm was worth $140,000. Hershberger explained that a livable residence generally adds value to the land, but that depends on an inspection and its condition. She believed that public water and sewer availability increases value, though she listed the availability of them to the farm as unknown in her report. She saw demolition equipment on site but did not know if any demolition had taken place. Additionally, the unique location of the farm could make the property more valuable to certain buyers.

{¶ 33} Hershberger reviewed the appraisal done by Elizabeth Sigg, Jason's appraiser. She noted that Sigg included demolition costs in her appraisal, included value for a barn, and used more distant comps. Hershberger emphasized that her comps were closer in distance and time and were all in unzoned townships, like the farm was. Hershberger said that appraisal involves subjectivity and maintained that her close and recent sale comparables best indicated the farm's fair market value.

{¶ 34} On cross-examination, Hershberger acknowledged she and counsel chose a hypothetical vacant-land appraisal due to lack of access rather than seeking access to the property. She agreed that this methodology affected the comparables that she chose. She did not make any adjustments to her comps, despite the comps not being identical to the farm. Instead, she used a dollar-per-acre approach, which required her to take the average of the three sales' price per acre to find her price-per-acre figure of $7,000. She did not include tillable acreage percentages for the subject or comps in her report, although buyers, especially farmers, consider tillable percentages and cleanup and

demolition costs in making purchase decisions. One of her comps was marked "invalid" by the auditor. This did not mean that the sale was invalid for her purposes, however, which she determined after verifying the transfer with the auditor and checking MLS data. She did not note any of that verification in her report.

{¶ 35} Although Hershberger acknowledged that the size of a parcel influences its value and that larger parcels tend to have more value, she still applied an unadjusted per-acre average from her larger comps. She agreed that an "as-is" appraisal including structures would require access and is ideally preferred for accuracy. She reiterated that a livable structure typically adds value, and including structures would require a different appraisal form and different comparables. Hershberger explained that she appraised the farm as vacant ground and compared it to bare-ground sales, given the property's uniqueness and its location next to a factory.

{¶ 36} Perry testified that Jason first raised the idea of buying the farm to him on September 9, 2023, at the Williams County fair. He remembered the conversation clearly because he attended the fair with his wife and four grandchildren and recalled discussing Jason's idea on the ride home. During their conversation, Jason asked how he would feel about Jason purchasing the farm, and Perry responded that keeping it in the family would be good. Jason described plans to tear down the house and barn and build a new residence with space for Margo and said that one of his sons would build a house farther east on the property. He also made a joke about Perry being comfortable giving him a "family discount." Jason did not mention that he had already purchased the property

16.

during their conversation. Perry told Jason to check with Connie because she was also a beneficiary, and Jason replied he was not worried about Connie but was worried about "the one up north," whom he later identified as Amanda. Perry believed that Jason knew there were other beneficiaries, but he did not know that Jason had already spoken with Connie.

{¶ 37} Perry later learned Jason had closed on the purchase on September 6, 2023, three days before their conversation at the fair. He learned about the sale in October 2023 when Amanda called to tell him about it. He was surprised to learn of the sale and had no indication from Jason on September 9 that the purchase had already occurred. He received a check for $5,313.75 with the trustee's distribution packet and later received another $2,000 check from Margo as trustee, which he did not cash and gave to counsel. He did not receive any correspondence from Margo about selling the farm before receiving the checks.

{¶ 38} Perry explained his understanding that he, Connie, and the other beneficiaries were heirs, and that his role as an heir was to see the trust carried out as written.

{¶ 39} On cross, Perry confirmed that he likely saw Jason at a Fourth of July party, but the first time Jason shared the idea of buying the farm with him was September 9 at the Williams County Fair. He thought that their conversation lasted about five to ten minutes and happened while he sat on a lawnmower, with his wife present and four grandchildren nearby. Perry was initially happy about keeping the farm in the family.

17.

He later told Jason to check with Connie. He expected Connie, as the eldest aunt and family matriarch, to contact the rest of the beneficiaries because he thought that a group decision was required. However, he was not intimately familiar with the trust terms beyond recalling that fair market value was important. Jason did not say he had already talked to Connie or that he had already bought the property during the fair conversation. Perry denied that his account only made sense if the conversation occurred in July rather than September and insisted that he knew when it happened.

{¶ 40} Perry learned of the sale in October, approximately four to six weeks after the fair. Amanda contacted him with the news. He confirmed that he had not spoken with Margo about the sale. He believed that the authority to sell rested with Raymond and then Margo. He later learned that Connie had spoken with Jason about the sale in July 2023 and that, at the time of the fair discussion, Jason had already purchased the farm. Perry said this upset him because he believed Jason knew Connie was dealing with personal difficulties and he could have spoken to others instead.

{¶ 41} After presenting this evidence, the beneficiaries rested.

{¶ 42} Next, Jason presented his case. He first called Sigg, a certified general real estate appraiser and broker with over 35 years of experience in Northwest Ohio. She has taught appraisal and real estate courses for 20 years, authored multiple textbooks, and serves as chair of the Ohio State Appraisal Board. Jason hired her to appraise the farm's fair market value. She inspected the property in January 2024, which included touring the house. Sigg called the assignment "complex" due to the property's mix of a house, a

18.

barn, and tillable acreage. She learned that two outbuildings had been demolished after purchase. She concluded that the residence was a teardown because repair costs would exceed the house's value due to its severe settling, sloping floors, nonfunctioning furnace, poor roof, peeling exterior, and structural problems. She assessed the land's highest and best use as agricultural because the house did not contribute to its value, the site had significant tillable acreage, and the area's market supported farm use over residential. In her sales comparison approach, she searched Williams County sales within one year, focusing on mixed-use parcels with tillable acreage and similar characteristics, and relied on MLS, auctioneer, and auditor records. She selected three Williams County comparables sized 39.92, 29.5, and 80 acres, and calculated each parcel's percentage of tillable acres because of its central importance to value. She adjusted for the percentage of tillable acres because farmers pay more per acre for higher tillable ratios. She also adjusted for property size because farmers pay more for larger farms. After adjustments, the range was $4,235 to $5,361 per acre. From that range, Sigg chose $4,700 per acre as the value for the farm. Thus, she valued land at $94,000 ($4,700 times 20 acres). Then, she addressed existing improvements because they impact value. She determined that it would cost $10,500 to tear down the house and that the barn added $12,000 in value to the land. After deducting the cost of the teardown and adding the value of the barn, Sigg concluded that the farm was worth $96,000 as of January 20, 2024.

{¶ 43} Sigg reviewed Hershberger's appraisal. She noted that it used a hypothetical condition of vacant land, did not include inspection of the house, used

19.

comps with more than 90 percent tillable acreage while also saying that the farm was not a working farm, and used one MLS-verified sale that the auditor had incorrectly flagged as invalid. Sigg opined that two of Hershberger's comps required downward adjustments for the greater tillable acreage percentages and larger sizes and lacked explanations for not having those adjustments. The third was a small site that was unlikely to be used for agricultural purposes and was more likely to be used for residential purposes, so it was an unlikely and unsuitable choice for farm-ground valuation. Sigg said that hypothetical vacancy can inflate value because ignoring existing structures increases tillable acreage. Additionally, appraising farm ground was outside of the scope of a certified residential appraiser's license.

{¶ 44} Sigg confirmed that her $96,000 value opinion remained unchanged and said that her opinion was grounded in considerations of the property's mixed-use features and market trends favoring agricultural use. She also said that a public auction is not necessary to determine fair market value and that finding mixed-use comparables is challenging but routine in her practice.

{¶ 45} On cross, Sigg testified that auditor values are computer-generated and less reliable than a boots-on-the-ground appraisal, which includes full on-site observation. auditor models use large sales datasets and rarely involve recent individual inspections. She confirmed her belief that lack of interior inspection was less accurate than an interior inspection when the assignment requires valuing existing conditions, especially when there is a need to assess repairability. Sigg acknowledged that appraisers sometimes lack

20.

access to structures and that parts of appraisal—particularly comparable selection and final reconciliation—are subjective, but decisions must align with professional standards and peer reasonableness. She bases her adjustments on spreadsheets of market data that she continually updates, which she uses because there is no standard industry database.

{¶ 46} Sigg knew that the farm abutted an industrial property to the south but was unaware that it abutted an industrial project to the east. These industrial properties did not change her view that the highest and best use of the farm was agricultural because the parcel's long, narrow shape would make it unattractive to industrial buyers. She explained that fair market value reflects a typical buyer, not a unique adjacent buyer, which would be a different assignment. She confirmed that the mixed-use nature and lower percentage of tillable acres justify a lower price than highly tillable auctioned farms and that the mixed-use nature made the assignment more difficult. She defended her use of an "invalid" comp based on its MLS listing, a proper arm's-length transaction, and having the required documentation in her work file. She described her teardown determination for the house as a reasonable judgment based on severe settling, interior leakage, safety concerns preventing her from inspecting the basement, and the deterioration she saw. Ultimately, the cost to cure the damage would exceed the home's value. She noted that the effect of the two demolished outbuildings was impossible to determine without having inspected them. She confirmed that the property is unzoned and that annexation into Pioneer could impose different requirements.

21.

{¶ 47} Brandie is Raymond and Margo's daughter, and she grew up on the Lashaway farm property. She received a text in January 2021 from Connie telling her that someone was interested in purchasing the farm. She was not surprised because people had often approached the family over the years about buying the property. Around this time, Melvin made two or three unplanned visits to Margo that turned unpleasant, which concerned Brandie and her sister. As a result, Brandie and Brenda met with Shaffer in January 2021 to learn about Margo's rights, particularly whether Margo could be forced to leave the farm or the property could be sold without her knowledge. Shaffer told them that Margo had a life lease, could not be made to leave, and the property could not be sold without her knowledge. He specifically told Margo, "the ball's in you[r] court[.]" Brandie took that to mean that Margo decided whether and when to leave. They did not discuss whether Margo had a right to sell.

{¶ 48} Brandie understood from Raymond that when Margo no longer desired to live on the farm after he died, the property would be sold. By 2023, Margo's finances became tight, due to Margo's loss of benefits and expensive prescriptions, and the farmhouse needed major repairs. In spring 2023, Brandie, Brenda, and Margo decided that by fall or winter Margo would have to move, likely to Brenda's home or an aunt's home. In early summer 2023, Jason casually said that he might buy the farm, but Brandie initially dismissed the idea. She did not overhear Jason's July 4 conversation with Perry and did not know Jason would approach Connie about buying the farm. She learned Jason had talked to Connie after their mid-July text exchange when Jason told her about

22.

the conversation and she read the texts on his phone. Jason then shared his plan to buy the farm and build a house with space for Margo. Jason did not discuss the price with her; she saw the proposed purchase price only in the texts and did not know the auditor's value at the time. Jason arranged a meeting with Shaffer within days, which Brandie attended with Margo. Margo reacted with relief because the plan let her stay on the property and relieved her financial strain.

{¶ 49} At the meeting with Shaffer, Jason said that he and Connie agreed to an $80,000 purchase price. Shaffer checked the auditor's site showing that the value was $126,000 and remarked Jason was getting a "[f]amily discount." He also asked about the need for an appraisal, which Jason denied. Shaffer then asked Margo if she agreed to the purchase price. Margo claimed that she had no say in the matter, leading to several back-and-forth exchanges between her and Shaffer in which Shaffer told her she did have the say. Eventually, Margo said if Connie agreed she would not step on her toes and she just wanted out. Shaffer warned that if the other beneficiaries were not consulted and not satisfied with the purchase price, they could sue. Brandie believed, based on her earlier understanding of the trust, that the four siblings controlled the trust and that as sole survivor Connie was the final decision-maker. She conveyed that belief to Jason and told Shaffer that the family respected Connie and would not go against her. Regardless, Shaffer cautioned them that money can change people. Brandie did not recall discussion of a fair market value requirement at that meeting. She believed Jason was not taking advantage and was trying to help Margo, and that he did not know the trust terms.

23.

{¶ 50} After closing, Brandie received an initial distribution check in October and deposited it. She and Brenda declined any further money when Jason later paid an additional amount after getting an appraisal.

{¶ 51} On cross, Brandie confirmed that the purpose of the January 2021 meeting was to learn whether the siblings could sell the farm out from under Margo, and they asked about that due to Melvin's behavior. She did not believe at the time that Margo had authority to sell and would have handled Melvin differently if they had known. She did not recall "trustee" being mentioned at that meeting. She understood from Shaffer only that Margo should see him if she decided to leave, and they did not ask about the mechanics of any sale. By July 2023, she believed Connie had the authority to sell, but Shaffer told Margo directly that Margo had the control, which surprised both Brandie and Margo. Brandie still thought Connie's agreement to the sale meant that it could proceed. She did not think that Margo was acting in bad faith or trying to sell behind the family's back and believed that Margo had little understanding of the trust. Brandie had some general knowledge from her father but her confusion about sale authority existed until the July 2023 meeting. Margo maintained that as long as Connie agreed, she would not step on Connie's toes and she just wanted out. Brandie claimed that Margo stayed out of family affairs involving the Lashaways. Raymond was the one who handled them.

{¶ 52} Brandie reiterated that the purpose of the January 2021 meeting was to ensure that Margo could not be forced out of the farm, and Shaffer assured them that the siblings lacked authority to sell the farm out from under her due to Margo's life lease.

24.

They did not take the 2021 statements to mean that Margo was in charge. Instead, they interpreted "the ball's in your court" to refer to Margo remaining in the home. In responding to Connie's January 2021 text message, Brandie told Connie that she was not sure Margo was ready to make a decision yet. She was referring to deciding about leaving the farm, not to selling the farm.

{¶ 53} Regarding the July 2023 meeting, Brandie recalled Shaffer remarking that $80,000 seemed low and asking if it was a family discount but did not recall him making further inquiry or him and Jason discussing the condition of the property. She did not feel guilty about Jason getting a family discount because she believed that someone would have voiced any objection they had. She understood Shaffer's warning that the beneficiaries could sue if they were dissatisfied with the price but believed that no one would go against Connie. She did not feel an obligation to notify her cousins because she believed only the siblings controlled the trust and that her generation had no power. She confirmed that Shaffer made clear in 2023 that selling was Margo's decision, while in 2021 he had only said that the farm could not be sold out from under Margo. After the July 2023 meeting, they did not discuss Shaffer's concerns.

{¶ 54} Brandie knew of outside offers, including hearing from her father that someone offered $100,000 in 2020, but she did not discuss any offers with Margo beyond confirming that Margo did not want to leave. Brandie was aware that Margo was paying a loan tied to the farm but made no plan for the balance other than that sale proceeds would pay the bank first, as she understood from her father.

25.

{¶ 55} Jason testified that he pursued buying the Lashaway farm after his parents died because he saw it as a chance to build a home for himself and Brandie. He decided that he needed to speak with Connie because he believed she was the family leader and the person in charge. He did not have a copy of the trust and was not part of prior family discussions about the trust. He called Connie to arrange a meeting and did not arrive unannounced. He told Connie he wanted to buy the farm, relieve his mother-in-law's daily stress, and build a home large enough for them and Margo. Connie loved the idea. He mentioned a price of $80,000 and that the existing house would be torn down. He explained that he arrived at $80,000 based on his own sense of the land's value from farming and what he wanted to spend. He sent Connie the auditor's valuation screenshot so she had an idea of its value. In mid-July 2023, he texted to confirm that $80,000 was acceptable and said that he wanted to be around $80,000 if she was okay with that, to which Connie replied, "let's move forward." He understood "let's move forward" to mean proceed with the sale, not to consult other beneficiaries, examine the trust, or get an appraisal. He told his wife and Margo they would get a new house, and they were excited. He then contacted Michael Shaffer to handle the paperwork.

{¶ 56} At the July 22, 2023, meeting with Shaffer, Jason relayed the price and that Connie had approved, and heard Shaffer say the family could sue if they were unhappy. He believed that he showed Shaffer the texts and recalled Shaffer saying it looked like Jason was getting a deal. Shaffer said the price had to be within the range of fair market value and $80,000 was on the low side of that range, but he did not define the range.

26.

Jason told Shaffer that he planned to tear down the house and some buildings. Shaffer explained to him that Margo, not Connie, had to sign the deed, which was the first time Jason learned that information. He did not take this as an instruction to talk to anyone else or get an appraisal.

{¶ 57} Jason closed on the farm on September 6, 2023. He paid cash from an advance on his inheritance approved by his sister and stepbrother. After closing, when Jason saw Perry at the Williams County fair, Perry was happy about Jason buying the farm and said that he did not care about the money.

{¶ 58} In text messages that she sent after closing, Connie told Jason that she was going to have to reconsider their deal because she did not have the authority to make the decision, Melvin's, Lloyd's, and Raymond's heirs were supposed to be involved, and Connie did not contact anyone else but should have. Jason was unaware of those details, which is why he talked to Connie before going to the lawyer to proceed with the sale. During this text conversation, Jason also told Connie that his parents' 40-acre farm had recently sold for $150,000, which was significantly less than its actual sale price. However, he claimed that the sale happened after closing and did not influence the purchase of the farm in any way. If Connie had required an appraisal or higher purchase price, Jason would have discussed with his wife whether to proceed.

{¶ 59} Jason obtained a value opinion of $105,000 from a real estate company and later obtained a $96,000 appraisal from Sigg. His former counsel advised paying the difference to align with the $96,000 appraisal, excluding Connie's share because she

27.

agreed to the $80,000 purchase price and Brandie's and Brenda's shares because they disclaimed them. Jason deposited funds into a bank account that he arranged to be opened for the trust so that Margo could disburse them. He confirmed that the account still holds the funds.

{¶ 60} On cross, Jason agreed that he thought of Connie as family leader and did not involve Margo in initial talks because he thought that Margo just lived on the farm. He told Connie in July that the plan was to build a house and move Margo in, without first confirming Margo's wishes. He first spoke with Margo after Connie agreed and before meeting with Shaffer in July. He learned at that meeting that Margo, not Connie, had authority to sell the property, but it did not change his actions because he believed if Connie approved, Margo would not care. He confirmed that he made extra disbursements after receiving the $96,000 appraisal and put the money into a new bank account for Margo to distribute. By the July meeting, Jason knew that Margo was the trustee, which meant that she was the only one who needed to sign off on the deal, and that $80,000 was on "[t]he low end of" fair market value. He proceeded with the purchase believing that Margo's and Connie's approval of the sale was sufficient.

{¶ 61} Although he testified that he told Shaffer that Connie had approved the purchase price, at his deposition, Jason said that he told Shaffer that the family was on board "as far as [he] know[s]." He clarified that he only talked to Connie, did not know that he needed to talk to anyone else, and did not know who else Connie might have talked to about the sale. He denied that Shaffer advised him to consult the other

28.

beneficiaries. Jason understood Shaffer's warning that families can sue when money is involved. He knew about the mortgage on the farm and acknowledged that it was paid off at closing.

{¶ 62} Jason admitted that he did not research fair market value before offering $80,000. Instead, he picked a number that he wanted to pay. He maintained that Connie agreed to $80,000 and he viewed his role as making an offer that Connie accepted, not as setting terms of the sale. He confirmed that the post-closing texts did not affect his conduct before closing. He admitted that he "misquoted" the amount his family farm sold for in the post-closing texts with Connie and said that he did not actually go to the bank or pay interest on the money he used to buy the farm because he used an advance on his inheritance from his parents. The declining real estate market he cited came from information he learned from his realtor and what he saw with properties in his parents' estates.

{¶ 63} Jason sought valuations of the farm after learning of the beneficiaries' objections. After receiving the $96,000 appraisal from Sigg, Jason paid only $8,000 of the $16,000 price difference into the trust's bank account. That is because, on advice of prior counsel, he excluded Connie's share, and he received deferrals from Brandie and Brenda. He did not pay the full $16,000 to the trustee to allow her to determine what to do with it.

{¶ 64} Jason felt that the property was worth $80,000, which is why he wanted to pay that much for it. He also said that if the sale were voided, he would expect

29.

reimbursement of the mortgage payoff because that debt was not his. However, he did not believe that he would be able to collect that debt from Margo.

{¶ 65} After he testified, Jason rested.

{¶ 66} Finally, Margo testified that she did not participate in creating the Lashaway Family Trust, was not invited to meetings about the trust, and knew no details of the trust at that time. Raymond referred to the trust only as "a paper" and told her if something happened to him, she would go to the lawyer's office to get the paper. She first recalled seeing the trust document when she received paperwork related to this lawsuit. She described a longstanding marital pattern where Raymond handled decisions, told her to "just sign" documents, and she typically did so without asking questions. After Raymond's death in December 2020, Margo met with Shaffer in January 2021 primarily to make a will and medical decision documents, not to address the farm or trust duties. At that meeting, she believed Connie was in charge and did not understand that she had any authority under the trust. Shaffer told her that "the ball's in your court," which she understood to mean that she would stand in for Raymond if the trustees had a meeting. She did not believe at that time that she had authority to sell the farm. In July 2023 Margo again met with Shaffer when she and Jason were planning to move forward with the sale. Shaffer informed her that she, as the surviving spouse and trustee, had to sign to convey the farm and that Connie was not in control. Even then, Margo did not feel that she fully understood the trust or her role and repeatedly said that she would not go against Connie. She believed that Connie had agreed to the sale based on her

30.

discussions with Jason.  Shaffer told her that a fair market price was required and said that the proposed price was "low," but she did not know what fair market value meant. She relied on Shaffer's guidance that the mortgage would "come off the top" of the sale proceeds and that he would "handle all the rest."  She confirmed that she signed numerous sale-related documents in Shaffer's office, following his direction to sign them, without reading them and without independently understanding them.  Margo acknowledged her signatures on the trust and related deeds from 2002 and admitted that she did not read those at the time she signed them either.

{¶ 67} Margo explained that her understanding of "fair market value" came solely from Shaffer telling her it was required; she did not know the concept before and did not evaluate the sale price of the farm beyond deferring to Connie's supposed agreement to it.  Regarding the decision to sell, Margo said that Jason came to her in late August or early September 2023 after talking to Connie and asked her if she was ready to pack.  She agreed to proceed with the sale if Connie agreed to it because she believed that Jason had negotiated with Connie.  She also relied on Shaffer's statement that she had to sign documents for the sale.  Margo struggled financially after Raymond's death, and upkeep of the farm was difficult, which contributed to her moving forward with the sale. Prior counsel advised her to open an account and disburse additional funds to the beneficiaries, using money that Jason provided, to bring them up to the amount of the appraisal.

31.

On cross, Margo confirmed that she had discussed with her daughters in spring and summer of 2023 that finances were tight, and she had come to realize that she likely would not stay through the winter. Jason did not pressure or force her regarding the sale and presented the plan as a way for her to remain on the farm, which she viewed as "the Lord's answer to a prayer." In her role as trustee, she relied on Shaffer to properly close the sale in accordance with the terms of the trust.

{¶ 68} Margo reiterated that Shaffer made clear in July 2023 that Connie had no authority and that the sale was Margo's decision, though she initially found that hard to believe and wanted to involve Connie. Margo returned to Shaffer's office several days later to sign the purchase agreement. She signed as trustee. Shaffer did not discuss fair market value at that signing; he simply laid out papers and directed her to sign. Margo did not understand in 2002 that the siblings were giving up their inheritance so that she and Raymond could stay on the farm. Her understanding of their duties when she and Raymond took the mortgage out on the farm included paying taxes and upkeep of the farm. Margo paid taxes annually but sometimes late, and there were late charges and force-placed insurance on the loan over the years. Shaffer told her that the mortgage payoff would come "off the top," and she did not know if that was fair to the beneficiaries.

{¶ 69} Margo consistently believed that Connie was in charge until Shaffer told her otherwise in July 2023, and much of what she believed about Connie's role in negotiations came from Jason. She left the farm because finances were tight. She

32.

intended to speak to Connie about leaving the farm, but she did not end up speaking with Connie before the sale. She acknowledged stating in an interrogatory that she believed that she had to vacate the property after a sale arranged by Connie, but she testified in court that she did not recall providing that specific answer. Margo did not regret how she proceeded despite being warned by Shaffer about a possible lawsuit.

{¶ 70} After her testimony, Margo rested.

{¶ 71} Following the trial, the trial court issued a decision finding in favor of the beneficiaries and against Jason and Margo. In its judgment entry, the trial court made the following findings of fact. First, the parties stipulated to a number of facts. They agreed that Raymond and Margo created the Lashaway Family Trust on May 29, 2002. They were the settlors and trustees of the trust. Raymond died on December 3, 2020, leaving Margo as the sole trustee of the trust. The only asset of the trust is property in Pioneer, Ohio, which the court referred to as the Lashaway farm. The farm was the home of Raymond's parents, Louis Earl and Fay Lashaway.

{¶ 72} Louis and Fay had four children, Melvin Lashaway, Lloyd Lashaway, Raymond, and Connie Salisbury. Melvin, Lloyd, and Raymond are deceased. Melvin is survived by Richard Lashaway and Perry Lashaway. Lloyd is survived by Jeffrey Lashaway, Steve Lashaway, and Amanda Lennard. Raymond is survived by Brandie Bailey and Brenda Dick.

{¶ 73} Fay, the survivor of Fay and Louis, died in 2001. The farm was an asset of Fay's estate. On April 3, 2002, the estate's fiduciary transferred the farm to Raymond

33.

and Margo. On April 9, 2002, Raymond and Margo, using the farm as collateral, signed a $65,000 note and mortgage in favor of the National Bank of Montpelier. On May 29, 2002, Raymond and Margo transferred the farm to the trust.

{¶ 74} On September 6, 2023, Margo transferred the farm to Jason. The State Bank and Trust Company, successor to the National Bank of Montpelier, filed a satisfaction of mortgage on September 11, 2023.

{¶ 75} Beyond the stipulated facts, the trial court found that all of the plaintiffs, plus Brandie and Brenda, are beneficiaries of the trust. Jason is Brandie's husband and Margo's son-in-law.

{¶ 76} The farm property is in a "'unique'" location because it is the first property north of the Pioneer village limits, it is bordered on the south by a plastic fabrication business, and it is bordered on the east by a large development project. There have been "multiple inquiries as to selling the property over the time that the Lashaways have owned the Farm."

{¶ 77} Fay intended to treat her children equally by distributing her estate to them equally. The farm was appraised at $150,000 in Fay's estate in 2002. Fay's estate owed several debts totaling approximately $55,000, and her will required the farm to be sold to pay the debts. The children agreed not to follow the will, however. While the estate was open, the children met with an estate attorney and reached an agreement under which they would not sell the farm. Instead, they would allow Raymond and Margo to remain

34.

living on the farm, which deferred their inheritance (except for a small payout they received from Raymond's loan proceeds).

{¶ 78} In order to remain on the farm, Raymond and Margo had to pay off the estate's debts. To do so, they took out the $65,000 note and mortgage. Raymond and Margo signed the mortgage in their individual capacities.

{¶ 79} Before Raymond and Margo signed the trust, the attorney who drafted it sent a copy of it to the siblings with a letter that told them to "'[p]lease pay particular attention to Article 1.'" This put the beneficiaries on notice and made them aware of the trust's terms.

{¶ 80} Raymond and Margo signed the trust and became the trustees on May 29, 2002. The trust allowed them to use and reside at the farm and required them to pay the real estate taxes, maintain and pay for fire and wind-storm insurance, and maintain the property in good condition. After the last of them died or they otherwise decided to leave the property, the real estate would be sold "at a fair market value." From the proceeds, the trustees would pay the settlors or their heirs the amount the settlors expended to enhance or improve the property. The rest would be divided equally among the beneficiaries or their children, if they were deceased. The trust did not address other farm expenses, farm income, or Raymond and Margo's personal debt on the farm. There was no requirement that the beneficiaries be given notice related to any terms of the trust. The trial court found the trust unambiguous and "interpret[ed] the Trust terms in the plain language stated in the document."

35.

{¶ 81} The testimony showed that the property was not maintained in "good" condition, as required by the terms of the trust.

{¶ 82} Margo viewed and signed the mortgage documents, the deed conveying the farm from her and Raymond individually to them as trustees, and the Lashaway Family Trust. The court found that Margo "had an opportunity since inception of the Trust to read, understand and inquire as to the meaning of these legal documents."

{¶ 83} Raymond and Margo lived at the farm from 2002 to 2020. Both of them contracted COVID in November 2020. Raymond died from COVID on December 3, 2020. Margo recovered but required new medications that were a monthly expense that added to her financial strain.

{¶ 84} Margo became the sole trustee of the Lashaway Family Trust at the time of Raymond's death. She met with attorney Michael Shaffer twice after Raymond's death to discuss her right to remain on the farm. At these meetings, Shaffer told her about the terms of the Lashaway Family Trust, that she was in charge, and that she could not be forced to leave the farm. Brandie was present for at least one of these meetings. After Raymond's death, Connie was approached by two prospective buyers of the farm. She directed them to Margo. She also sent Brandie a text message about one of the potential buyers, which Brandie acknowledged.

{¶ 85} Following Raymond's death, the farm deteriorated, the mortgage was not timely paid, and it became financially unrealistic for Margo to maintain the farm. Margo violated the terms of the trust by allowing the farm to deteriorate, failing to pay the

36.

mortgage timely, and failing to pay property taxes. The payment history for the mortgage showed that Margo made many late payments and failed to insure the farm over the years. As a result, the balance of the loan at the time of the sale was "significantly greater" than it should have been if she had adhered to the terms of the loan. At the time of the sale, property taxes for the farm were delinquent by $1,008.49.

{¶ 86} Jason's mother died in the spring of 2023 and left him more than $2 million. None of the beneficiaries, including Brandie, were aware of Jason's inheritance. Having this money allowed Jason to consider purchasing the farm. He planned to build a new home for his wife there that would include a place for Margo to live. The first person he talked to about this plan was Connie because he believed that he needed Connie to consent to the purchase and the purchase price. He told her that he wanted to pay $80,000 for the farm. Connie, "through all the documents that were provided to her over the years and by her own actions, knew she was not the 'decision maker' for the sale of the Farm."

{¶ 87} Jason told Brandie and Margo about his plan to buy the farm and build a new home in July 2023. After that, he contacted Shaffer, Margo's attorney, to schedule a meeting about proceeding with the sale of the farm.

{¶ 88} Margo, Jason, and Brandie met with Shaffer in July 2023. At the meeting, Shaffer "advised them of the dangers of moving forward without a fair market value determination of the Farm." Despite that, Margo, as trustee, entered into a purchase

37.

agreement with Jason, her son-in-law, on July 25, 2023, for $80,000. They did not have the property appraised to obtain its fair market value.

{¶ 89} The sale of the farm closed on September 6, 2023. Of the $79,556.31 that Jason brought the closing, $33,817.31 was used to pay off the note in Raymond and Margo's names, $1,661.68 was used to pay delinquent and prorated real estate taxes, $50 was used to pay a courier fee for the mortgage note, and $1,204.50 was used to pay attorney fees and closing costs. The remaining $43,259.97 was paid to Margo as trustee. Following the closing, Shaffer sent each beneficiary a final trustee's report and a distribution check. Only Raymond's children cashed their checks.

{¶ 90} After purchasing the farm, Jason demolished three outbuildings on the property. He did not present any evidence of whether he did this himself or accomplished it through a third party or offer any evidence of the cost of demolition. After the beneficiaries told Jason that they did not believe the farm was sold at fair market value, Jason obtained two appraisals. He considered the appraisal from Elizabeth Sigg (the appraisal with the lower value) as the fair market value of the farm. Based on that, he increased the purchase price of the farm to $96,000. "However, the amount that Jason has 'paid' to date is $88,000.00. He choose [sic] who was entitled to additional funds and never paid the fair market value in accordance to his own appraisal." The additional $8,000 that Jason added to the purchase price is held in a bank account. The beneficiaries who received additional checks have not accepted or cashed the checks.

38.

Shaffer testified that he had three meetings with Margo between the time Raymond died in the time she sold the farm. At the first meeting, in 2021, "there was concern as to whether Margo's occupancy at the Farm would terminate due to Raymond's passing." After reviewing the trust, he advised Margo that she had the right to occupy the farm. He testified that he would have reviewed the terms of the trust with her, told her that she was the trustee, told her that she had rights under the trust, and told her that "she was 'in control'."

{¶ 91} About two weeks later, they had another meeting to discuss the terms of the trust. At this meeting, Shaffer had fully reviewed the trust and "clearly advised that [Margo] was in charge under the Trust terms."

{¶ 92} At the third meeting, in 2023, they discussed Margo no longer wanting to live at the farm and wanting to sell the farm to Jason. Shaffer discussed Margo's responsibilities under the trust and the requirement that she sell the farm at fair market value. Margo and Jason told him that they had agreed to a sale price of $80,000. Shaffer looked up the property on the county auditor's website and discovered that the sale price was less than the auditor's valuation. Jason explained that the property "was in 'ill-repair'." He also told Shaffer that he had consulted with Connie, and Shaffer "believed that the purchase price was 'consented' to by the beneficiaries." Shaffer recalled telling them that "if the purchase price is not consented to, Margo had liability and 'they (the beneficiaries) could bring a law suit'." If Shaffer had been told or thought that the beneficiaries were not in agreement with the sale, he would have "asked more questions

39.

about the sale and would not have proceeded." At the end of the meeting, Margo instructed him to move forward with the sale, so Shaffer prepared the purchase agreement, which Margo and Jason signed.

{¶ 93} Shaffer knew of a prior offer to buy the farm for approximately $100,000, but he knew that the family did not want to sell to that buyer. The trial court specifically found Shaffer's testimony to be "creditable" and accepted his testimony as true.

{¶ 94} Connie testified that the farm was to be sold as part of her mother's estate proceedings, but Raymond asked to continue living on the farm, which he could only do by purchasing the property. Although Melvin was against the plan, she and Lloyd convinced him and the estate attorney to let Raymond stay on the farm. In exchange, Raymond and Margo would have to pay the estate's debts, maintain the buildings on the property, and pay property taxes and insurance. When they no longer lived on the farm, it would be sold and each sibling would receive their share.

{¶ 95} After Raymond's death, Connie was contacted by two prospective buyers. She referred both of them to Margo because she knew that Margo was in charge under the trust.

{¶ 96} In July 2023, Jason came to Connie to tell her that he wanted to purchase the farm for $80,000 to build a home for him, Brandie, and Margo. Connie assumed that Margo knew of and was in favor of Jason's plan. She did not know of any delinquent payments or remaining debt on the land. After their meeting, Jason followed up and told

40.

Connie that land values were decreasing and that he was getting bank financing, which would only allow for a purchase price of up to $80,000. The court found that Connie was aware of the terms of the Lashaway Family Trust and knew that she could not decide to sell the farm. It also found that there were "creditability" issues with Jason's testimony, while Connie was a "creditable" witness.

{¶ 97} Perry testified that Jason never told him that he had purchased the farm, despite having the opportunity to do so at a Fourth of July party and at the Williams County fair in September.

{¶ 98} Jason disputed Perry's testimony and claimed that he did tell Perry about his plan to buy the farm. He also claimed that he went to Connie believing that she had to agree to the sale. Both Perry and Connie were happy for him. He did not hear back from Connie right away after their meeting, but when she texted him back, she told him she thought that the price would be more. Jason did not talk to Margo or Brandie about buying the farm until he heard from Connie.

{¶ 99} Margo testified that she did not get involved in the household's financial affairs. She was aware that they took out a loan to pay Fay's estate's debts to stay on the farm after Fay died. Around that time, Raymond told her to go to the lawyer to sign a paper. If anything happened to him, she was to go to the lawyer to get the paper. The court found it credible that Margo did not take an interest in the Lashaway Family Trust or care about its terms while Raymond was alive. After his death, Margo and her family members were advised multiple times that she had responsibilities as a trustee. Margo

41.

said, "I don't care to understand" the trust, and said, "I don't understand and don't want to know" about the sale of the farm to Jason. She also said that she did not read any of the legal documents. The court found this testimony "believable and significant." The court had before it three different valuations of the farm. First was a written opinion of value from a real estate firm that valued the farm at $105,00. Second was Hershberger's appraisal that valued the farm at $140,000. And third was Sigg's appraisal that valued the farm at $96,000. Based on the evidence before it, the court determined that "the disparity in the fair market values provided by the appraisers, the interest by individuals over the years to purchase the Farm, and the unique location of the Farm does not permit the Court to make a Finding of Fact as to the fair market value of the Farm based on the evidence provided. The only fair way to determine fair market value is an arm's length transaction, without undue influence, with a willing buyer."

{¶ 100} Regarding the claims against Margo, the court found that the beneficiaries had proven breach of fiduciary duty, breach of trust, breach of duty of loyalty, and unjust enrichment.

{¶ 101} Regarding breach of fiduciary duty, the court found that Margo owed a duty to each of the beneficiaries when she became the trustee of the Lashaway Family Trust. She signed documents that placed her in that position but did not read them. She was advised by an attorney several times over multiple years about the trust, its terms, and her role. The court found that "ignorance of her responsibilities is not a valid defense, nor is her disinterest and blatant lack of regard to understand the role she

42.

assumed when Raymond passed." Despite being "articulate and able to understand the issues presented[,]" Margo did not "care[] enough to fully understand the responsibilities she had" or ask to be removed as trustee. The court found this to be "a gross and reckless breach of her fiduciary duty, including a breach of her duty of loyalty."

{¶ 102} Regarding the debts that were paid from the proceeds of the sale, the court found that the terms of the trust unambiguously required Margo to pay the taxes on the property. It also found that the mortgage was in Raymond and Margo's individual names, not in their names as trustee. The farm was used as security for the loan that Raymond and Margo took out in 2002 to pay off Fay's estate debts so that they could remain on the farm. If the mortgage had not incurred late fees and forced insurance payments over the years, the amount owed at the time of the sale would have been significantly less. The court also found that it was Fay's intent to treat each of her children equally, and the siblings' actions did not change that fact. Thus, Raymond "was to be treated equally with the other siblings and receive his share of the sale proceeds . . . ." The court concluded that

> [t]he debt was Raymond and Margo's individually and if it still existed at the time of final sale, would have been required to be paid by Raymond and Margo. There was no provision in the Trust requiring that debt in the individual names of the debtors, be paid and reduce the beneficiaries' share of proceeds. The other siblings should not "contribute" to the original debt to pay the expenses of Fay's estate as they received no benefit from the delay in the receipt of their inheritance. Further Raymond would have received his one-fourth (¼) share of the Farm's sale proceeds. Fay's intent was equal treatment. Requiring the siblings to now pay the debt of Raymond, is not equal treatment.

43.

It found that Margo breached her fiduciary duty to the beneficiaries when she paid her property taxes and the balance of the mortgage from the proceeds of the farm sale.

{¶ 103} Next, the court found that Margo breached her fiduciary duty to the beneficiaries by failing to require Jason to pay the full $96,000 appraisal price that he had relied on.

{¶ 104} Regarding the beneficiaries' claims of undue influence and coercion against Jason, the trial court found that "[s]o many of the facts of this case go into the finding of undue influence and coercion[,]" including that all of the benefits of the sale went to Margo, Jason, and Brandie; Jason "orchestrated the sale of the Farm in all ways"; and Margo, Jason, and Brandie were all present when Shaffer told them that the farm had to be sold for fair market value. The court found that Margo was a susceptible person because of her inability to pay her debts and her complete disinterest in her responsibilities as trustee. It also found that Jason had the opportunity to exert influence over Margo as her son-in-law and through Brandie. Brandie knew of Margo's financial situation, helped her budget, and helped her pay bills. After Jason told Margo about his plan, Margo "was secured in knowing she could continue to stay at the Farm in a 'new home'." Critically, [d]ue to the Trustee's disinterest in her role as Trustee, Jason was able to assume that "role", without authority, and did the following:

- Declared that Margo would be terminating her occupancy of the Farm, without first consulting Margo;
- Set the purchase price for the Farm at $80,000;
- Gave notice to Connie of his intent to purchase;

44.

- Contacted Margo's attorney for an appointment for the sale of the Farm, and went to the appointment with Margo;

- Obtained two appraisals of the real estate and decided on his own which appraisal to use when a dispute arose;

- Decided the amount of the additional funds that he would pay to the Trust and to whom (which beneficiaries) he would pay the funds;

- Arranged through his Bank to open a Trust checking account;

- Instructed Margo how to make the additional distributions to the chosen beneficiaries.

- To this date, Jason has not paid the Trust the purchase price represented by the appraisal that he relied upon. And the Trustee has made no demand for the full payment.

The court found that Jason took all of these actions for self-serving purposes, and the sale went through after warnings issued by Margo's attorney. It also found that the beneficiaries suffered financial loss because of Jason's and Margo's actions.

{¶ 105} Regarding fraudulent conveyance, the court found that Shaffer would not have moved forward with the sale if he had known that the beneficiaries did not consent. However, "Jason led Attorney Shaffer to believe that there would not be a dispute, when they [sic] had not taken any steps to ensure that was true." This misrepresentation of beneficiary consent caused the sale to occur. And throughout the discussions of the sale, Margo chose to stay out of the conversations.

{¶ 106} The court also found that Margo, Jason, and Brandie were unjustly enriched by the farm sale transaction. Margo was unjustly enriched by having her debts paid from the sale proceeds. Jason and Brandie were unjustly enriched by retaining the value of the farm above the price Jason paid for it.

45.

{¶ 107} Finally, the court determined that Jason's argument that Connie was not entitled to any additional money for the farm because she consented to the $80,000 sale price was without merit.

{¶ 108} The court voided and rescinded the sale of the farm, ordered Jason and Brandie to convey the farm back to the Lashaway Family Trust, ordered the farm sold at public auction, ordered Brandie and Brenda to return the distributions they had received from the sale, ordered all of the distribution money returned to Jason, and granted Jason a judgment against Margo totaling $35,528.99 for the real estate taxes, courier fee, and mortgage note payoff that Jason paid at closing.

{¶ 109} Jason now appeals, raising four assignments of error.

Assignment of Error No. 1

The Trial Court's Decision to Rescind the Deed is Against the Manifest Weight of the Evidence and Contrary to Law.

Assignment of Error No. 2

The Trial Court erred in Failing to Restore Appellant Jason Bailey to his Original Position After Voiding the Fiduciary Deed.

Assignment of Error No. 3

The Trial Court erred in Concluding that the testimony of Beth Sigg should be disregarded.

Assignment of Error No. 4

The Trial Court Erred in Concluding that Jason Bailey was Unjustly Enriched.

{¶ 110} Margo also appeals, raising four assignments of error.

46.

1. The Trial Court erred by rendering a judgment of fraud and undue influence that was against the manifest weight of the evidence and unsupported by the factual record presented at trial.

2. The Trial Court erred in determining that it possessed the authority to rescind a fiduciary deed, despite the trustee's lawful execution of the conveyance pursuant to her authority under the Trust.

3. The Trial Court erred in its interpretation and application of the Trust instrument and relevant provisions of the Ohio Trust Code, resulting in a mischaracterization of the trustee's duties and a failure to give effect to the settlor's intent.

4. The Trial Court erred by holding that the trustee was obligated to convey Trust property free and clear of mortgage debt, despite the Trust's acceptance of the property subject to an existing mortgage.

## II. Law and Analysis

### A. There is some competent, credible evidence supporting the trial court's decisions on fraud and undue influence.

{¶ 111} In their first assignments of error, Jason and Margo each argue that the trial court erred by finding against them on the beneficiaries' fraud and undue influence claims. Jason argues that there was not clear and convincing evidence of fraud because the evidence showed that he told Shaffer that he had spoken to Connie about buying the farm for $80,000, but he did not tell Shaffer that he had spoken to all of the beneficiaries about the purchase price. He also claims that it was Margo—not him—who led Shaffer to believe that there would not be a dispute about the purchase price. And he says that his discussion of the purchase price with Connie did not involve any concealment or misrepresentation. Regarding undue influence, he claims that there was not clear and

47.

convincing evidence to support the beneficiaries' claim because there is no evidence of coercion or improper influence.

{¶ 112} Margo argues that the beneficiaries failed to show that she acted fraudulently because she was outside of the business dealings for the sale of the farm and none of the trial testimony showed her misleading or making false representations to the beneficiaries. Regarding undue influence, she contends that the evidence fails to show that she was pressured or mislead by Jason. She points to Shaffer's testimony that he saw no evidence of Jason trying to take advantage of her, and her testimony that she felt confident in her decision after Shaffer explained the legal risks and duties to her. She also contends that the trial court disregarded evidence that she acted in good faith and executed her duties as trustee in a reasonable manner.

{¶ 113} The beneficiaries respond that there is ample evidence supporting the trial court's decision. They claim that Jason placed himself in a position of influence by offering Margo a new place to live while keeping her on the farm, he decided on the $80,000 purchase price without any basis, he did not tell Connie about Margo's mortgage balance or delinquent taxes, and he led Connie to believe that Margo was aware of his plan, he intended to talk to the other beneficiaries, land values were decreasing, and he could not afford to pay more than $80,000. Jason also made the appointment with Margo's attorney and led him to believe that all of the beneficiaries were on board with the plan, and he would not have proceeded with the sale if he did not believe that.

48.

{¶ 114} As to Margo, the beneficiaries point out she was careless regarding her duties as trustee, not bothering to read the trust or to understand what was in it. When Shaffer warned her that she was selling the farm for less than fair market value, she chose to proceed with a sale that benefited her personally to the detriment of the beneficiaries.

{¶ 115} We review a judgment following a bench trial under a manifest weight of the evidence standard. *Terry v. Kellstone, Inc.*, 2013-Ohio-4419, ¶ 12 (6th Dist.). In reviewing the judgment, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the trial court's judgment must be reversed. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. As part of this review, we presume that the trial court's findings of fact are correct because the trial court "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). We will not reverse a judgment supported by some competent, credible evidence going to all the essential elements of the case as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. Additionally, "'[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate

49.

ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" *State v. Wilson*, 2007-Ohio-2202, ¶ 24, quoting *Seasons Coal* at 81.

{¶ 116} The elements of fraud are:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Burr v. Bd. of Cty. Commrs. of Stark Cty.*, 23 Ohio St.3d 69 (1986), paragraph two of the syllabus.

{¶ 117} Here, there is some competent, credible evidence going to every element of fraud, so the trial court's decision is supported by the manifest weight of the evidence. First, there is evidence that Jason represented to Shaffer that the family found $80,000 to be an acceptable purchase price for the farm, and without that representation, Shaffer would not have proceeded with drafting the documents for the sale. Jason knew that only Connie had agreed to the $80,000 purchase price, as he had not discussed it with any other beneficiaries. He also knew that the price was below fair market value based on his knowledge of the county auditor's value and Shaffer's conversation with him and Margo during which Shaffer looked at the auditor's website and commented about Jason getting a discounted price. Additionally, Connie testified that she agreed to the $80,000 price because she thought that land values were decreasing based on information that Jason gave her.

50.

**{¶ 118}** Jason's intent to mislead Shaffer can be inferred by his failure to disclose or clarify that no one in the family except Connie had agreed to the purchase price. *See Kerbler v. Biltwell Contracting LLC*, 2024-Ohio-5607, ¶ 79 (5th Dist.) (intent to defraud can be inferred from the surrounding facts and circumstances). His intent to defraud Connie can be inferred from him telling her that he planned to discuss the sale with Perry and by telling her that land values were decreasing. It was reasonable for Shaffer to rely on Jason's representation in proceeding with the sale paperwork, and for Connie to believe that Jason was going to discuss the sale with at least Perry before proceeding. Finally, the beneficiaries were harmed by the resulting lower sales price.

**{¶ 119}** The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). A judgment is not against the manifest weight of the evidence simply because the court finds some witnesses or evidence more believable than others. *Harding v. Harding*, 2016-Ohio-7028, ¶ 24 (9th Dist.). The trial court chose to believe the beneficiaries' version of the evidence—which supports all of the elements of fraud—and we cannot reverse the trial court's decision on that basis.

**{¶ 120}** A party claiming undue influence must prove: "'(1) a susceptible party; (2) another's opportunity to exert [influence]; (3) the fact of improper influence exerted or attempted; and (4) the result showing the effect of such influence.'" (Brackets in

original.) *In re Estate of Flowers*, 2017-Ohio-1310, ¶ 87 (6th Dist.), quoting *West v. Henry*, 173 Ohio St. 498, 510-511 (1962).

{¶ 121} The record also supports the trial court's finding of undue influence. First, Margo was a susceptible person. She was elderly, recently widowed, dealing with health problems, struggling financially, and did not want to leave her home on the farm. Jason had the opportunity to exert influence over Margo by virtue of being her son-in-law and by purchasing the farm where she was living and wanted to remain living. He exerted improper influence by offering to alleviate her financial difficulties by giving her a place to live on the farm when he built his new house there. And the result of that influence was Margo selling him the farm for less than fair market value. Because these findings are supported by some competent, credible evidence in the record, the trial court's finding of undue influence is not against the manifest weight of the evidence.

{¶ 122} Jason's and Margo's first assignments of error are not well-taken.

## B. There is some competent, credible evidence supporting the trial court's decision on unjust enrichment.

{¶ 123} In his fourth assignment of error, Jason argues that the trial court erred by finding that he was unjustly enriched. He claims that he has not been conferred and retained a benefit at the beneficiaries' expense because he paid the full, negotiated purchase price at closing and then paid additional money to all of the beneficiaries except Connie after he received Sigg's appraisal. The beneficiaries respond that the farm is worth some amount of money (albeit an undetermined amount) over the $88,000 that Jason has paid for it and through his undue influence, the farm was fraudulently

52.

conveyed to him, allowing him to retain the benefit of that additional value, while they have been deprived of that part of their inheritance.

{¶ 124} Unjust enrichment occurs when (1) a plaintiff confers a benefit upon a defendant, (2) the defendant has knowledge of the benefit, and (3) the defendant retains the benefit under circumstances where it would be unjust to do so without payment. *Cuspide Props., Ltd. v. Earl Mechanical Servs.*, 2015-Ohio-5019, ¶ 60 (6th Dist.), citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984). "An action in unjust enrichment will lie ' . . . when a party retains money or benefits which in justice and equity belong to another.'" (Ellipsis in original.) *Liberty Mut. Ins. Co. v. Indus. Comm. of Ohio*, 40 Ohio St.3d 109, 110-111 (1988), quoting *Stan-Clean of Lexington, Inc. v. Stanley Steemer Internatl., Inc.*, 2 Ohio App.3d 129, 131 (10th Dist. 1981).

{¶ 125} Here, there is some competent, credible evidence showing that Jason retained value that belonged to the beneficiaries. Although the fair market value of the farm is still up in the air, it has been appraised at $96,000, $105,000, $126,000, and $140,000, and a potential purchaser had offered $100,000 for the property. Jason has paid $87,556.31 for the farm. This is $8,400 less than even the lowest appraisal amount. Jason was aware of at least three of the valuations because two of the appraisals were obtained at his request and one came from the county auditor's website, which he sent to Connie. Jason unilaterally chose the lowest of those valuations as the appropriate measure of the farm's value and gave Melvin's and Lloyd's children additional money but did not give Raymond's children any additional money because he obtained waivers

53.

from them and did not give Connie any additional money based on R.C. 5810.09. He claims that this is sufficient to show that he has paid full value for the farm. However, R.C. 5810.09 provides that, with certain exceptions, a trustee is not liable to a beneficiary for breach of trust if the beneficiary consented to the conduct constituting the breach, released the trustee from liability for the breach, or ratified the conduct. *Id.* By its very terms, the statute applies only to trustees and beneficiaries; it does not extend to third parties involved in business dealings with trustees and beneficiaries. Thus, Jason cannot rely on the statute to support his position that Connie was not entitled to the additional payment he made to Melvin's and Lloyd's children. So, assuming that the waivers from Raymond's children are valid, at the very least, Jason has retained approximately $4,200 in value to which he is not entitled. This is sufficient to show that Jason was unjustly enriched. Therefore, Jason's fourth assignment of error is not well-taken.

### C. The trial court did not err in weighing Sigg's testimony.

{¶ 126} In his third assignment of error, Jason argues that the trial court abused its discretion by "disregarding Sigg's appraisal as being too disparate to Hershberger's." He contends that Hershberger did not possess the proper credentials to appraise farm ground and did not follow appropriate appraisal methods, so the trial court should have disregarded her appraisal and given Sigg's appraisal more consideration than it did.

{¶ 127} "'Failure to either object or move to strike evidence at trial on the basis of hearsay, a witness' qualifications, or purported foundational deficiencies, waives any challenge on appeal, save plain error.'" *Schmidt v. Crayne*, 2024-Ohio-4726, ¶ 132 (6th

54.

Dist.), quoting *Michigan Millers Mut. Ins. Co. v. Christian*, 2003-Ohio-2455, ¶ 32 (3d Dist.); *Hummel v. Suglia*, 2003-Ohio-5226, ¶ 58 (11th Dist.), quoting *State v. Ritchie*, 1997 WL 164323 (9th Dist. Apr. 2, 1997) ("It is well-established that a 'failure to object to the qualifications of an expert witness at trial waives that error on appeal.'"). Jason did not object to Hershberger's qualifications or methodology at trial, so he has waived all but plain error review of these issues on appeal.

{¶ 128} The application of plain error in civil cases

> is sharply limited to the *extremely rare* case involving *exceptional* circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself. . . . The plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court . . . .

(Emphasis in original.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). This is not such an extremely rare and exceptional case. Thus, we find no plain error related to Hershberger's qualifications or methodology.

{¶ 129} Regarding the weight that the trial court gave to Sigg's appraisal, "[t]he weight to be given an expert's testimony is to be determined by the trier of fact." *Donithan v. Donithan*, 1990 WL 134310, *2 (12th Dist. Sept. 17, 1990). The court can accept all, part, or none of the expert's testimony and give the testimony "whatever weight it deem[s] appropriate." *Id.* Because the trial court had the discretion to accept all, part, or none of Sigg's testimony and give her testimony the weight it deemed appropriate, we cannot say that the court's refusal to wholly accept Sigg's appraisal was error. Jason's third assignment of error is not well-taken.

55.

## D. The trial court properly rescinded the deed.

{¶ 130} In her second assignment of error, Margo argues that the trial court lacked the authority to rescind the fiduciary deed used to transfer the farm from her, as trustee, to Jason. She contends that the trial court could intervene only if a breach of trust occurred, but the evidence presented at trial did not establish that Margo breached her duties as trustee. Rather, the evidence showed that she acted in good faith, consulted an attorney who did not tell her that the sale was unauthorized or the price was improper, and relied on Connie's apparent authority and consent. The beneficiaries respond that the evidence shows that Margo was "careless" regarding the trust; she never read the trust, did not understand the trust, and did not care to understand the trust. Shaffer also warned Margo that the purchase price Jason proposed was less than fair market value and that the beneficiaries could sue her if she went through with the sale, but she did it anyway and personally benefited by having her personal mortgage debt paid from the proceeds of the sale.

{¶ 131} Under R.C. 5808.01, "[u]pon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with Chapters 5801. to 5811. of the Revised Code." A trustee who commits breach of trust is liable to the trust beneficiaries. R.C. 5810.02(A). If the trial court finds a breach of trust, the court is authorized to, among other things, void an act of the trustee. R.C. 5810.01(B)(9).

56.

{¶ 132} "'It is well settled that every violation by a trustee of a duty which equity lays upon him, whether wilful [sic] and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust.'" *Keybank N.A. v. Thalman*, 2016-Ohio-2832, ¶ 15, quoting *Shuster v. N. Am. Mtge. Loan Co.*, 139 Ohio St. 315, 343 (1942). To prove breach of trust, the plaintiff must show that (1) the trustee owes a duty to a beneficiary, and (2) the trustee breached that duty. *Bryan v. Chytil*, 2021-Ohio-4082, ¶ 88 (4th Dist.). Some of the duties a trustee owes to the trust beneficiaries include

> the duty to "administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with Chapters 5801. to 5811. of the Revised Code," . . . the duty of loyalty and to avoid conflicts of interest, . . . the duty to "administer the trust as a prudent person would" and to "exercise reasonable care, skill, and caution," . . . [and] the duty to "take reasonable steps to take control of and protect the trust property" . . . .

*Id.*, quoting R.C. 5808.01; R.C. 5808.04; and R.C. 5808.09; and citing R.C. 5808.02. We review the trial court's breach of trust findings under the manifest-weight-of-the-evidence standard.

{¶ 133} The evidence presented at trial showed that Margo breached several of her duties as trustee of the Lashaway Family Trust. First, Margo did not attempt to administer the trust in accordance with its terms and in the interests of its beneficiaries or attempt to administer it as a prudent person would and to exercise reasonable care, skill, and caution. She did not read the trust to learn its terms and what being trustee required of her and did not take any reasonable steps to determine the farm's fair market value before selling it to Jason. Instead, Margo chose to remain ignorant of her duties under the

57.

trust and chose to proceed with the sale to Jason even after being warned that $80,000 was below fair market value and could result in the beneficiaries suing her. Second, Margo entered into a transaction that is statutorily presumed to be a conflict of interest by selling the farm to her son-in-law. R.C. 5808.02(C)(2) ("A sale . . . involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with . . . the spouse of a trustee's descendant . . . ."). Finally, she failed to take reasonable steps to protect the trust property by failing to pay the income taxes, maintain the required insurance coverage, and allowing the property to fall into disrepair. All of these findings are supported by some competent, credible evidence in the record, so they are not against the manifest weight of the evidence.

{¶ 134} Because Margo committed breach of trust, the trial court was authorized under R.C. 5810.01(B)(9) to void her act of selling the farm to Jason. Therefore, Margo's second assignment of error is not well-taken.

### E. The trial court's interpretation is consistent with the plain language of the trust.

{¶ 135} In her fourth assignment of error, Margo argues that the trial court imposed a duty to transfer the farm property free of encumbrances that is not in the terms of the trust. She claims that she reasonably relied on the terms of the trust and administered the trust in good faith, which is sufficient to protect her from liability under R.C. 5810.09. She points out that the property was encumbered with a mortgage taken out to pay Fay's debts when it was transferred into the trust, and she was effectively

58.

using the sale proceeds to satisfy Fay's obligations, so using trust funds to pay off the mortgage was not inconsistent with her fiduciary duties.

{¶ 136} "'A court's purpose in interpreting a trust is to effectuate, within the legal parameters established by a court or by statute, the settlor's intent.'" *Arnott v. Arnott*, 2012-Ohio-3208, ¶ 14, quoting *Domo v. McCarthy*, 66 Ohio St.3d 312 (1993), paragraph one of the syllabus; *Wyper v. DuFour*, 2019-Ohio-1035, ¶ 14 (6th Dist.). In general, when the language of the trust is unambiguous, the settlor's intent can be ascertained from the express terms of the trust itself. *Natl. City Bank v. de Laville*, 2006-Ohio-5909, ¶ 28, citing *Domo* at 314. Any words used in the trust are presumed to be used according to their common, ordinary meaning. *In re Trust of Brooke*, 82 Ohio St.3d 553, 557 (1998). But when ambiguity exists or the settlor's intent is unclear, a court may consider extrinsic evidence to determine the settlor's intent. *de Laville* at ¶ 28, citing *McDonald & Co. Secs., Inc., Gradison Div. v. Alzheimer's Disease & Related Disorders Assn., Inc.*, 140 Ohio App.3d 358, 363 (1st Dist. 2000). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 2008-Ohio-4838, ¶ 16. The construction of a written trust is a matter of law that is reviewed de novo. *Arnott* at ¶ 14.

{¶ 137} The key terms of the Lashaway Family Trust are in Article 1, which states:

> The Gift Trust shall be administered and disposed of as follows:

59.

1. During the Settlors' lives and as long as either Settlor lives in the house for ten months per year, pays all real estate taxes, maintains fire and wind-storm insurance coverage, and maintains the property in good condition, Settlors shall have the right to continued use and occupation of the property.

. . .

2, After the termination of the right of occupancy by reason of death or otherwise, the property will be sold at a fair market value and *from the proceeds of the sale the trustees will pay to the Settlors, or their beneficiaries, an amount equal to the amounts expended by the Settlors to enhance or improve the real property subject to this trust. The balance shall be divided in four shares and distributed per stirpes* to Melvin Lashaway, Lloyd Lashaway, Raymond Lashaway and Connie Fae Salisbury.

(Emphasis added.)

{¶ 131} The terms of the trust are clear and unambiguous. First, "proceeds" are "the amount of money received from a sale[.]" *Black's Law Dictionary* (10th Ed. 2014); *see also Merriam-Webster Online*, https://www. merriam-webster.com/dictionary/proceeds (accessed Feb. 12, 2026) ("the total amount brought in"). They differ from "net proceeds," which are "[t]he amount received in a transaction minus the costs of the transaction[.]" *Id.*; *see also Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/proceeds (accessed Feb. 12, 2026) ("the net amount received . . . after deduction of any discount or charges"). The trust does not indicate that any payments are to be made from the *net* proceeds of the sale; it clearly refers only to the "proceeds," which indicates *all* of the money realized from the sale.

60.

{¶ 132} Second, the only expense that the trust authorizes to be paid from the proceeds of the sale of the farm is "an amount equal to the amounts expended by the Settlors to enhance or improve the real property subject to [the] trust." That is, the trust authorizes payment only for any money that Raymond or Margo spent to enhance or improve the farm. There is no evidence that Raymond or Margo in fact spent money to enhance or improve the farm, so Margo was not entitled to any payments from the proceeds of the sale. Although Margo argues that "[t]he trust contained no directive precluding her from paying off the mortgage or to otherwise convey the property subject to liens . . .[,]" this ignores the fact that there is nothing in the express terms of the trust that authorized payment of the mortgage existing on the property—or any other expense beyond costs of enhancement or improvements—before the balance of the proceeds was divided among the trust's beneficiaries. By paying her personal debt out of the sale proceeds, Margo violated the terms of the trust. Margo's fourth assignment of error is not well-taken.

**F. The trial court did not abuse its discretion when fashioning its remedy.**

{¶ 133} In his second assignment of error, Jason argues that the trial court erred by awarding him a judgment against Margo in the amount equivalent to the mortgage that he paid off with the funds he brought to closing. He contends that the court awarded him a judgment that he never sought and, in doing so, failed to return him to the position he was in before the sale and awarded the trust monetary damages for the benefit of the beneficiaries.

61.

{¶ 134} The beneficiaries respond that the trial court was not required to restore Jason to the position he was in before the sale because he came to the transaction with unclean hands. Regardless, the trial court's remedy attempted to restore Jason to the position he was in before the sale without transferring Margo's personal debt to the trust or the beneficiaries.

{¶ 135} In her third assignment of error, Margo argues that the trial court erroneously required her to convey the farm free of encumbrances and to obtain fair market value as a condition of a valid transfer, despite those terms not appearing in the trust. Because those terms are not in the trust, and Margo exercised her discretionary powers under the trust in good faith, she claims that the court did not have the authority to override her actions.

{¶ 136} All of Margo's arguments under this assignment of error presuppose that she was acting in good faith and did not breach her duties as trustee. But, as we have already discussed, the record supports the trial court's findings that Margo breached the trust and did not act in good faith. A trial court has discretion under R.C. 5810.01(B)(3) and (10) to "[c]ompel the trustee to redress a breach of trust by paying money . . ." or "[o]rder any other appropriate relief" for a trustee's breach of trust. *Bryan*, 2021-Ohio-4082, at ¶ 97 (4th Dist.) ("[T]he Ohio Trust Code gives trial courts discretion to choose among various remedies when a court finds that a trustee committed a breach of trust."). Thus, we will review the trial court's decision for an abuse of discretion. Abuse of

62.

discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

{¶ 137} The trial court in this case used its powers under the trust code to fashion a remedy that attempted to make both the trust and Jason whole, while also making Margo responsible for the debt that she, personally, incurred when she and Raymond purchased the farm. By the time the trial court entered its judgment, the money that Jason brought to closing and used to pay the balance of Margo's mortgage note was no longer available to be returned to Jason; it had been given to the bank for Margo's benefit. The court's solution was to award Jason a judgment against Margo—the person who retained the benefit of the money Jason paid. We cannot say that this was an abuse of discretion.

{¶ 138} Moreover, as the beneficiaries point out, Jason, as the wrongdoer, came to this transaction with unclean hands, so the court was not required to use its equity powers to restore him to his presale position. *See Prokos v. Hines*, 2014-Ohio-1415, ¶ 117 (4th Dist.), quoting *Bradford v. Reid*, 126 Ohio App.3d 448, 454 (1st Dist. 1998) ("[I]t has long been the rule in Ohio that one seeking equity must come to the court with clean hands. . . . This maxim denies all relief to one, no matter how well-founded his claim may otherwise be, if, 'in granting the relief which he seeks, the court would be required, by implication even, to . . . give its approval to the inequitable conduct on his part.'").

{¶ 139} Because the court attempted to restore Jason to his presale position and used its discretionary powers under R.C. 5810.01(B) to remedy Margo's breach of trust,

63.

Jason's second assignment of error and Margo's third assignment of error are not well-taken.

## III. Conclusion

{¶ 140} For the foregoing reasons, the March 28, 2025 judgment of the Williams County Court of Common Pleas is affirmed.  Jason and Margo are ordered to divide the costs of this appeal equally under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Thomas J. Osowik, P.J. | [[Applied Signature]] |
| | JUDGE |
| Christine E. Mayle, J. | [[Applied Signature 2]] |
| | JUDGE |
| Myron C. Duhart, J. | [[Applied Signature 3]] |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.